**Don Arden MYERS, Sr., Plaintiff,**

v.

**GLYNN–BRUNSWICK MEMORIAL HOSPITAL and National Medical Enterprises, Defendants.**

**Civ. A. No. 287–54.**

United States District Court, S.D. Georgia, Brunswick Division.

March 31, 1988.

Amanda F. Williams, Brunswick, Ga., Fletcher Farrington, Savannah, Ga., James G. Williams, St. Simons Island, Ga., for plaintiff.

Henry A. Huettner, Atlanta, Ga., Wallace E. Harrell, Brunswick, Ga., for defendants.

ORDER

ALAIMO, Chief Judge.

Don Myers was a management-level employee of the Glynn–Brunswick Memorial Hospital ("Hospital") who was reassigned to a lower-paying position in 1985. He alleges that the reassignment violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and seeks appropriate relief. The defendants, Glynn–Brunswick Memorial Hospital Authority ("Authority") and National Medical Enterprises ("NME"), a management subcontractor, move for summary judgment. The defendants argue that there are no issues of *material* fact which indicate that age played a determining role in the deci-

sion to reassign plaintiff.[1] The Court agrees and summary judgment will be entered for the defendants.

## FACTS

The Hospital is a public, tax-supported institution which is operated by the Authority, a nine-member board which makes the major business decisions concerning the Hospital's operation. In October 1979, the Authority entered into a contract with NME for day-to-day management services. Under the contract, NME provided a Hospital Administrator and a Financial Officer for a set fee. The first administrator provided by NME was John Bartlett, who held that position until he was replaced by Michael Berry in July 1983. David Dunham replaced Berry in July 1985, and continues to manage the Hospital today.

From the time of NME's arrival in 1979 until Myers' reassignment in September 1985, he was the Director of Professional Services, one of eight directors below the Hospital Administrator. In his position, Myers was responsible for the management function of the departments of laboratory, pharmacy, physical therapy, cardiology, respiratory therapy and volunteer services, which included the hospital auxiliary and Red Cross. Additionally, Myers was a qualified pharmacist but had not practiced pharmacy for a number of years.

The position of Director of Professional Services was eliminated in a limited reduction-in-force in September 1985. Myers' duties were assumed by three individuals, already employed at the Hospital, all of whom were under the age of 40. Myers was 57 at the time.

Myers was given the option of resigning, retiring early or bumping the most recently hired staff pharmacist and assuming that position. He chose the third alternative, and currently holds that position at the Hospital. The reassignment resulted in a pay decrease of $4,673 (from $34,673 to $30,000) per year. Plaintiff contends that there were other, undescribed, diminished benefits resulting as well. Defendants refute that contention. Williams Affidavit, Ex. A, ¶ 9.

Defendants summarize the reasons for the elimination of Myers' position as follows: When Dunham arrived in July 1985, there was a downward trend in the average number of Hospital beds being occupied. For the previous five years, the Hospital's average daily census declined from more than 270 to between 190 and 195 beds, which was barely more than half of the Hospital's 340–bed capacity. Further, Hospital finances were deteriorating due to unfavorable changes in the Medicare reimbursement process; and the budget projections for 1985 predicted that the Hospital would end up losing money for the year at then-existing staffing levels. Accordingly, the Authority instructed Dunham to prepare alternative reduction-in-force plans which included reductions in both management personnel and hourly workers. Dunham prepared six reduction-in-force proposals. After considering the various proposals, the Authority voted on a plan to delete ten positions, one of which was the Director of Professional Services, held by Myers.

According to defendants, the Authority decided to eliminate Myers' position instead of other management positions because the duties involved could be easily reassigned to other administrative personnel without harming the quality of medical care. Although the Authority was under no contractual obligation to offer Myers an alternative position, certain members of the Authority urged Dunham to find another position for Myers. Accordingly, Myers was given the option of bumping a pharmacist.

Although Myers does not dispute the basic chronology of events outlined above, he argues for a broader perspective. In an attempt to show a pattern of purposeful

---

1. Defendants' original motion included an alternative ground for granting judgment in favor of NME, arguing that NME was not an "employer" under the ADEA. Defendants later retracted that argument. *See* Defendants' Amendments to Motion, ¶ 5 (instructing the Court to delete the first four paragraphs of Section VI of their brief —the entire section dealing with the issue). Although the argument arose Phoenix-like in the rebuttal brief, the Court declines to address the issue as presented.

age discrimination by NME, Myers focuses on various actions by the NME administrators which occurred prior to his individual reassignment, some of which affected other Hospital employees.

According to James Allen, another long-serving member of the Hospital's administration, early in Bartlett's administration (1980 or 1981), Bartlett told Allen and Myers that they were "buffalo hunters" and doubted whether they could keep up with his fast-paced management style.

Lynn Brock, a former administrative secretary at the Hospital, averred that Bartlett wrote that Myers was "not in the youth-oriented style of NME," and that Bartlett told her "that he had been told to get rid of the old management and bring in a whole new team." Brock Affidavit, at 1, 2. Brock's affidavit goes on to relate employment-related stories of five other individuals, who she states were victims of an age-discrimination policy of NME. She stated that Gil Wright, the former Personnel Director, was replaced by a younger person; that Brock's mother did not apply for an opening at the Hospital because she was informed that her age would preclude her consideration; that Bartlett drafted an advertisement for a "young and attractive" replacement secretary (the ad never ran because his secretary did not resign); that Lucille Lott, former Director of Admissions, was purposely pressured by an increased workload into resigning; and that Sgt. Willie Drury, former Chief Security Guard, was also purposely pressured by an increased workload until he struck Allen and was terminated. It appears that all of the above actions occurred during Bartlett's administration. Brock also averred that Berry, a former administrator, attempted to pressure Myers into resigning by increasing his workload with "impossible deadlines." After Dr. Myers came through with all projects in a timely manner and with excellent results, "Mr. Barry [sic] was overheard by me to say that he had a problem with terminating Dr. Myers because of his outstanding work results." Brock Affidavit, at 4–5.

Plaintiff also relates the employment history of Tom Crankshaw, a former administrator, who was replaced with a younger person.

Regarding the actual reduction-in-force plan which eliminated Myers' position, plaintiff has introduced a document which provides the following details:

Positions reduced or eliminated:

| Position | Name | Age | Salary |
|---|---|---|---|
| Nurse Recruiter | Mary Hodges | 34 | $ 24,856.00 |
| Staff Developer | Shoranne Murphy | 32 | 26,873.60 |
| Staff Developer | Carol Bryant | 40 | 25,833.60 |
| PBX Operator | Vi Drury | 54 | 9,921.60 |
| Red Cross Coordinator | Doris Bankston | 55 | 17,763.20 |
| Professional Services Director | Don Myers | 57 | 34,652.80 |
| Employee Health Nurse | Dainne Cleiland | 41 | 24,356.80 |
| Outreach Coordinator | John Scott | 40 | 13,624.00 |
| Security Officer | Pat Doss | 55 | 19,864.00 |
| Laundry Utility | Vanessa Pickens | 32 | 7,113.60 |
| | Total | | $204,859.20 |
| | (17% fringe costs) | | 34,826.03 |
| | Total | | $239,685.23 |

Positions added since 1984:

| Position | Name | Age | Salary |
|---|---|---|---|
| Physical Therapist | Carolyn Barnes | 31 | $ 20,700.00 |
| Physical Therapist | Adelle Kapp | 55 | 20,700.00 |
| Clinical Supervisor | Francis Boyd | 41 | 31,500.00 |
| Patient Educator | Pam Cope | 29 | 25,500.00 |
| Exercise Physiologist | Diane Rancourt | 43 | 24,500.00 |
| Pharmacists | John Jordon | 48 | 136,800.00 |
| | Tracy Swaim | 24 | |
| | Thomas Braswell | 46 | |
| | Eddie Lyde | 34 | |
| | Ronald Slade | 49 | |
| | Total | | $259,700.00 |
| | (17% fringe costs) | | 44,149.00 |
| | Total | | $303,849.00 |

Williams Affidavit, Ex. A, pp. 3–6.

Myers stresses that seven of the ten persons holding the eliminated positions were forty years of age or older and that the total savings from the positions eliminated was less than the total costs arising from newly created positions at the Hospital. Although Myers does not refute that the Hospital Administrator predicted decreased revenues in 1985, he points out that such a decrease did not in fact occur; rather, a substantial increase in revenues occurred in 1986 (from $1,748,847 in 1985 to $4,905,734 in 1986). Dunham testified that approximately two million of the 1986 revenues represented Medicare carry-overs from prior years.

Finally, plaintiff has introduced, as expert testimony, the affidavit of Robert Mooney, a consultant to the Hospital.

Mooney states that, in his opinion, the reduction-in-force plan utilized by the Hospital did not comport with guidelines promulgated by the American Hospital Association. He believes that eliminating the position of Director of Professional Services does not reflect sound hospital management; and that, once the decision to eliminate that position was made, Myers should have been given the option of bumping a less-experienced and younger administrator rather than bumping a pharmacist.

While it is clear that Myers believes he was treated unfairly, it is equally clear that he has failed to establish a violation of the ADEA. He has not shown evidence that a nexus existed between a consideration of his age and the decision to eliminate his position.

DISCUSSION

The ADEA provides, quite simply:

It shall be unlawful for an employer [to] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age.

29 U.S.C. § 623(a).

Because our modern society had established a pattern of disadvantaging older workers, Congress enacted the ADEA to eradicate invidious discrimination against persons who are at least 40 but less than 70 years of age. *Id.*, §§ 621, 631(a). While the Act provides redress for all manner of adverse employment actions based on age discrimination, courts must always be mindful that the statute is not a panacea for all actions which employees perceive as unfair. The Act only outlaws discrimination *"because of* such individual's age." As Judge Wisdom stated:

[T]he statute [does not] require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for

no reason at all, as long as its action is not for a discriminatory reason.

*Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984).[2]

At the same time, courts recognize that those who discriminate are becoming more sophisticated in their efforts to camouflage their motives and that direct evidence of invidious discrimination is rare these days. Accordingly, courts have identified a number of situations where a plaintiff is entitled to a rebuttable presumption that discrimination prompted the adverse action, despite the lack of direct evidence of discriminatory motives. *See McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas* and its progeny, the courts have developed a burden-shifting analysis to review a plaintiff's claim of discrimination. Once a plaintiff makes out a *prima facie* case of discrimination, the employer must attempt to rebut the presumption of discrimination with evidence that a legitimate, non-discriminatory reason prompted its actions. The plaintiff then has the opportunity to offer evidence that the employer's proffered reasons are pretextual.

*Nix* highlights three variations of the *prima facie* case: (1) a member of the protected class, who is qualified for the position, is discharged and replaced with a person outside of the protected class; (2) a member of the protected class was discharged, while those outside of the class, having comparable or lesser qualifications, were retained; and (3) disparate application of workplace rules between members of a protected class and persons outside of the protected class. *Nix, supra* at 1185; *see also Pace v. Southern Railway System,* 701 F.2d 1383, 1385 n. 4 (11th Cir.), *cert. denied,* 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983) (*prima facie* case elements when there is a failure to hire, allegedly for discriminatory reasons).

---

2. In *Nix,* the Eleventh Circuit reversed a plaintiff's *verdict* under Title VII, ruling that there was insufficient evidence of race discrimination. Although Nix alleged race discrimination, courts have consistently used Title VII and ADEA cases almost interchangeably. *See, e.g.,*

*Pace v. Southern Railway System,* 701 F.2d 1383 (11th Cir.1983) (supporting the use of Title VII cases in ADEA cases but also cautioning against simple blind application); *Price v. Maryland Casualty Co.,* 561 F.2d 609, 612 (5th Cir.1977).

Additionally, under a disparate impact theory, a plaintiff can make out a *prima facie* case if he shows, generally through statistical analysis, that a seemingly neutral employment decision or criterion has a disproportionate impact upon a protected group. *See, e.g., Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Eastland v. Tennessee Valley Authority,* 704 F.2d 613 (11th Cir. 1983), *cert. denied sub nom., James v. Tennessee Valley Authority,* 465 U.S. 1066, 104 S.Ct. 1415, 79 L.Ed.2d 741 (1984).

Finally, certain situations, particularly where employers implement reductions-in-force, "require flexibility in analyzing whether a prima facie case has been established." *Pace, supra* at 1387. In those situations:

> such a determination turns on whether the plaintiff has presented sufficient evidence to provide a basis for an inference that age was a factor in the employment decision.... [N]o matter what test is used, the overall assessment of whether a prima facie case has been established must turn on whether, on the particular facts of a given case, the plaintiff has presented proof of a kind and quantity that requires the defendant to come forward with non-discriminatory reasons for the adverse employment action.

*Id.,* at 1387–88 (citations omitted); *see also McCorstin v. United States Steel Corporation,* 621 F.2d 749 (5th Cir.1980) (discussing the need for flexibility in reduction-in-force cases).

While the *McDonnell Douglas* analysis is a useful tool, the ultimate inquiry in all ADEA cases is whether the plaintiff has shown that proscribed discrimination was the "determining factor" for the employer's decision. *Spanier v. Morrison's Management Services, Inc.,* 822 F.2d 975, 980 (11th Cir.1987). That inquiry is

exceedingly factual and, at first, may appear impervious to summary judgment.[3] It is well established, however, that ADEA claims *are* subject to summary judgment.

If a plaintiff fails to make out a *prima facie* case, under any of the above variations, summary judgment in favor of the defendant employer is proper. *Pace, supra* at 1391; *see also Mauter v. Hardy Corporation,* 825 F.2d 1554 (11th Cir.1987) (summary judgment affirmed where positions were eliminated by the employer); *Barnes v. Southwest Forest Industries, Inc.,* 814 F.2d 607 (11th Cir.1987) (summary judgment affirmed in reduction-in-force situation). Additionally, if the plaintiff makes out a *prima facie* case, but the employer proffers a non-discriminatory reason for the discharge which remains unrebutted by the plaintiff, summary judgment is proper. *Simmons v. McGuffey Nursing Home, Inc.,* 619 F.2d 369, 371 (5th Cir. 1980).

In the instant case, plaintiff has not presented proof of a kind and quantity which entitles him to a presumption that age was a factor in the decision to eliminate his position. Further, plaintiff has presented *no* evidence which suggests that the reduction-in-force instituted by defendants was a pretext for discriminatory action.

Despite Myers' contentions to the contrary, there is no direct evidence that age discrimination prompted his reassignment. Bartlett's statements that Myers and Allen were "buffalo hunters" have no probative value in this case. While it is possible that one might infer that the statements prove *Bartlett* held age-based stereotypes, the statements are simply too attenuated to be probative here. *See Mauter, supra* at 1558 (A statement by a vice president of the defendant employer that "[t]he Hardy

---

**3.** Indeed, once a member of a protected class shows adverse employment action, one *can* make an inference that discrimination played a part in the employer's decision. However, without more evidence—apart from being a member of a protected class—such an inference would be based on speculation and conjecture. While Myers, as nonmovant in the summary judgment motion, is entitled to all *reasonable* inferences

arising from the facts, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970), an inference based on speculation and conjecture is not reasonable and may not be made by the Court. *Blackston v. Shook & Fletcher Insulation Co.,* 764 F.2d 1480, 1482 (11th Cir.1985); *Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1326 (11th Cir. 1982).

Company was going to weed out the old ones," was irrelevant where the vice president "played no part in the decision to terminate plaintiff.").

The issue here is whether *Myers' reassignment* resulted from age discrimination. The statements plaintiff offers to show that nexus were made some three to four years prior to his reassignment by an administrator who had left the Hospital more than two years before the adverse action. After three years and two intervening administrations, Bartlett's comments about Myers, both those made to Myers and Allen and those overheard by his secretary, Brock, are irrelevant to this inquiry.

The statements are not rendered relevant by Brock's recital of the employment history of other Hospital employees. Again, the incidents which she relates occurred during Bartlett's administration and are too remote from the action challenged in this case. Regardless that her affidavit, on its face, establishes that Lott *resigned,* that Drury was *discharged for cause* and that Brock's mother *never applied* for a position (all of which negate the possibility that those individuals could establish *prima facie* cases of their own),[4] a plaintiff cannot prove his case of discrimination simply by arguing that *others* were victims of discriminatory treatment.

Because Myers was not replaced, he does not fit within the elements of the traditional *prima facie* cases. He argues, however, that a new variation should be available in reduction-in-force situations. He argues that a plaintiff should be entitled to a presumption of discrimination when: (a) the plaintiff is a member of the protected class; (b) that his position is eliminated and the plaintiff discharged; and (c) that his job duties are reassigned to others within the organization who are outside of the protected class.

That formulation, when analyzed, does not logically suggest discrimination. The identity of who assumes duties—or indeed whether the displaced employee's duties are assumed at all—is irrelevant to a consideration of *which positions* should be eliminated when an employer sees a need to reduce the work force. The traditional *prima facie* cases suggest discrimination because we can see, objectively, that individuals who are comparable in qualifications and job duties, but who are different in age, gender or race, were treated differently. All other variables are objectively equal except the suspect classification. Thus, when the individuals are treated differently, we can infer that the *classification* prompted the differential treatment. Persons holding completely distinct administrative positions are not "comparable individuals" and a comparison of the ages of those holding eliminated positions with the ages of those who assumed their duties reveals nothing.

Of course, failure to meet the elements of the traditional *prima facie* cases does not end the inquiry. Myers, however, does not make out a case of disparate impact,[5] nor does he meet the *Pace* standard. The overall figures regarding the Hospital's hirings and firings from 1981 through 1986 belie any suggestion of age discrimination, *see* Defendants' Answers to Plaintiff's First Interrogatories, 1–4; and the statistics regarding the reduction-in-force and

---

**4.** In their rebuttal brief, defendants also point out that Gil Wright, another who Brock indicates was a victim of NME's discrimination, resigned from the Hospital in September 1979, *prior* to the arrival of NME or Bartlett. Marcum Affidavit, ¶ 1.

**5.** The Court acknowledges defendants' argument that reduction-in-force cases are not fully suited to disparate impact analysis. Because the criteria upon which the employer relies when deciding which positions are to be eliminated are not uniform, it is difficult to infer any correlation between the position eliminated and a discriminatory motive. *See Leichihman v.*

*Pickwick Int'l,* 814 F.2d 1263, 1269 n. 5 (8th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 116, 98 L.Ed.2d 116 (1987). At the same time, the Eleventh Circuit has utilized disparate impact in promotion case, which also involve primarily subjective criteria. *See Eastland, supra* at 619. Certainly, where there are many similarly situated employees subject to promotion or elimination, a statistical showing that members of a protected class are *consistently* adversely affected will raise a question as to the employer's selection process. In the instant case, the class of similarly situated employees—those in the managerial capacity—consists of one.

new hires are not placed in any relevant context which would enable an inference of discrimination to be made. *See Pace, supra* at 1388 (discussing a lack of context for plaintiff's evidence regarding 11 promotions and demotions); *Lindsey v. Southwestern Bell Telephone Company*, 546 F.2d 1123, 1124 (5th Cir.1977) (discussing the lack of context for evidence of 27 promotions). Although it is true that, in this case, 100% of the administrative positions eliminated impacted on the protected class (one out of one—Myers), the figure is meaningless as a "statistic" without evidence of the alternatives. While seven of the ten positions eliminated were held by persons in the protected class (two were 40, one 41, one 43, one 53, one 54, one 55 and Myers at 57), six of the ten new hires were also in the protected class (41, 43, 46, 48, 49 and 55). The figures, even assuming that such a small number provides a basis for consideration, do not suggest any age bias.

Finally, plaintiff's evidence does not reach the *Pace* standard of "proof of a kind and quantity" suggesting that age was a factor in the employer's decision. Stripped of the irrelevant, plaintiff has established only that he was 57 at the time his particular position was eliminated. While Myers believes that he was treated unfairly and his expert believes the decision was unwise, an inference that age discrimination prompted the action is not warranted. As in *Pace*, "[t]he possibility of a jury drawing a contrary inference sufficient to create a dispute as to a material fact does not reify to the point even of a thin vapor capable of being seen or realized by a reasonable jury." *Pace, supra* at 1391 (*quoting Simmons, supra* at 371).

CONCLUSION

Although *McCorstin* and *Pace* caution against rigid adherence to a formalized blueprint when analyzing an ADEA claim —particularly where the claimant's position has been eliminated due to a reduction-in-force—both recognize that employers are entitled to summary judgment when the only inference of age discrimination arises from speculation and conjecture. In the instant case, plaintiff has not presented

sufficient evidence to justify even an inference that age played a role in his employment opportunities. Accordingly, defendants' motion for summary judgment is GRANTED. The Clerk of the Court is directed to enter judgment in favor of the defendants, Glynn–Brunswick Memorial Hospital Authority and National Medical Enterprises, and against plaintiff, Don Arden Myers, Sr.